Good morning, Your Honors. May I please the Court? Oh, let me get a glass of water. Sure. Jonathan Gross, representing Appellant, American Zurich Insurance Company. I'd like to reserve approximately three minutes of time. This case is fairly complicated when you get to the math, but the core insurance principle is simple. And the core insurance principle is this. Does a builder's risk insurance policy pay for a contractor's voluntary and contractually obligated costs to perform its contract? That's the core principle. Respondents have changed it into a different argument. They instead would like the argument to be, or the issue to be, does the contractor, is it required to complete the contract before it can make a claim? And that's a false issue. And the reason it's a false issue is because all builder's risk policies have a termination point when the project's completed. When the construction's completed, the builder's risk policy ends, and the owner has to then buy regular property insurance, usually for higher premiums. So by definition, almost all builder's risk claims occur and happen before the construction is complete. So the framing of the issue by respondents is really a Trojan horse. The real issue here is whether the builder's risk insurance policy is going to pay for work that the contractor voluntarily and contractually is obligated to perform. The risks in a construction project are fairly well established. So at the beginning, the owner, in putting the project out for bid, tells the contractors what is the work that is to be done. From that scope of work, the contractors have to figure out how much they want to bid. And in this case, that's what happened. The owners put a lot of information out there, including drawings to show how much gravel would be created, specifications for additional gravel for settlement, all kinds of additional information. And each of the bidders, each of the contractors, had to decide how much they were going to bid because the low bid won the contract. The accuracy of the bid is the burden of, is the risk of the contractor. If the contractor underbids, underestimates what it's going to cost to build the contract and puts in a bid that's too low, that's their burden. And that's what happened here. Immediately after winning the contract with the low bid, MKB realized, uh-oh, we are thousands of cubic yards short in our estimate. And they tried to get the school district to increase the contract price. The school district said, no, that is your responsibility. That's the way things work. What the owner, the school district is responsible for, is paying for site conditions. So, for example, one of the site conditions, this being in Alaska, they can't work around the year. They can only work in the short summers, so they had to do phases. Another site condition, which is the issue in this case, is this project was being built on spongy tundra. Everybody knew it was going to contract under thousands and thousands, tens of thousands of tons of gravel. How much, over what period of time? Well, that's somewhat of a guess that the geotechnical consultant for the school district estimated. But the school district is responsible for the site condition, and the school district took responsibility for the site condition. In the contract documents, the school district told the bidders, estimate about two inches of settlement for when you do phase one, and we're going to put in for the rest of the settlement. And the school district continuously took the position, if there's more than two inches of settlement during phase one, we will pay for it. But you have to prove it. I'll just ask a question, because part of this, to me, sounds like a re-arguing before the jury of these issues, of what's happening. Here on appeal, we're focused, of course, on your appeal, particularly on the breach of contract claim, whether the jury's verdict should be reversed. And there's, as you know, a pretty high threshold for that in terms of the sufficiency of evidence on the record. What is your best argument as to why the verdict should be reversed? Let me tie it in. The insurance policy states that it will only pay for the actual cost of repairs. The insurance policy also states that it will not pay for costs of repairs that are done, made by somebody else. The jury wasn't instructed on those parts of the policy. Instead, the jury was told and instructed, it was a huge mishmash, and they were given a general verdict form to say, was there a breach of contract, and is there a, if so, how much money? But the core of it here is, there has to be steps in an analysis. Well, as far as the jury instructions, I don't think you challenged those. I know you challenged the verdict form, but not the instructions. No, Your Honor, we did challenge the instructions, and we challenged the instructions on the insurance policy language. So the instructions the court gave on the requirements of the insurance policy were objected to and challenged. Which instructions specifically in your brief? I believe there are 22, 23, I think there were three that were challenged, and my memory is not exact. It's in our brief, but I know, I believe 22 and 23, and I think there was one or two others that were challenged. And those were the instructions on what the policy required. And so the core of it here is, the jury should have been instructed on the ability to risk policies only paying for the actual cost of repairs and not for any repairs that are paid for by somebody else. The jury wasn't instructed on that. The jury instead was given a lot of language and told to figure it out. What we asked the court to deliver was a verdict form that had the jury walk through and do the factual analysis. That jury form was almost dizzying in its detail, and we've had cases where you leave to the discretion of the judge how far you're going to go in these special verdict forms, and it has to be really an abuse of discretion. And when you have a jury form that is so complicated that you are going to end up with an appeal on the nature of the jury form, it seems to me that it's pretty hard to overturn the rejection of that jury form. Well, Your Honor, this is a situation where a party is darned if it does and darned if it doesn't. And let me explain that. Well, there is something between the nature of that jury form and something else. Right. And let me be specific about this. A jury form should have been given where the jury did do specific factual decisions. The jury form that was submitted was submitted to throw everything in front of the court because if something wasn't asked in the proposed jury form, well, we would be deemed to waive it. But we're not . . . the appeal here is that there should have been something more than a general verdict. We're not saying that it was necessary and absolutely required that the verdict form proposed be given, but there should have been a verdict form that was specialized and did ask the pertinent questions. And in our briefing, we identify the pertinent questions. Right. Your Honor, did you have a question? Okay. So, what it comes down to is really the . . . there was no substantial evidence at trial that MKB did more than perform what it was contractually obligated to do. Counsel, if I could interject, this would help me with the size of this record, to know if there were any jury instructions that you may have objected to that were given and any counter-instruction that you proposed that was rejected on the question of what the contract required on Earth Movement. Your Honor, is your question focused on just Earth Movement or is it overall? Because I don't think that this case actually hinges upon Earth Movement by itself. Is that cost of repair language in the clause about Earth Movement? No, Your Honor. The cost of repair is a special endorsement. It's on, I believe it's volume 31, page 6439, and the endorsement is changes in valuation condition. And it's quoted . . . Was there an instruction about that special condition? No. Did you ask for one that was rejected? Your Honor, I don't remember. I apologize. I'm just trying to figure out which jury instructions, where you challenged them in your brief. Maybe you can point me to that, the ones you did challenge. In the brief . . . I know it's 22 and 23 and . . . If I could, with my reserved time, respond, I could look it up a little bit later. I'd hate to waste the court's time. All right. I mean, that would be helpful. It's just, it is a huge record. We've gone through it, but we do rely on the parties to be familiar with the record so that we can flip back and forth between your argument and the record. I appreciate that, Your Honor, and I apologize for not being conscious. I can tell you 22 and 23 definitely, and I think there's another one that I will refer you to when I get a chance. Thank you. So, I won't go into details. I think the briefs laid out fairly well, but the record . . . there is no substantial evidence that MKB actually put more gravel on the pad than it was contractually obligated to do. The record is very clear on that, and if the court has any questions about evidence cited by MKB, I would be happy to address it, but otherwise, I'll move on to my next argument. All right. Getting to the . . . regarding IFCA, IFCA has been held to be essentially . . . the enhanced IFCA damages are punitive damages. Notice is required, and IFCA is constitutional. We're not challenging the constitutionality of IFCA, contrary to MKB's position, because IFCA does require notice. It requires a 20-day letter that sets out the basis for the IFCA violation. The 20-day letter in this case did not set forth the IFCA violation that the court found ultimately was the violation here. Instead, the 20-day letter was completely consumed with questions about the investigation of the claim. Now, there is a lot of complaints about the way the claim was handled, and each one I could address and respond to, but the fact is that there was nothing deficient in the investigation. There was no facts that the investigation did not find. The investigation by American Zurich was thorough and complete, and maybe a consultant made a mistake here and there. There were some mistakes by consultants, but there was nothing lacking in the investigation, and the court record is voluminous, partly because the claim file is huge. The file of Nino and Moore is enormous, the consultant that was hired. So this claim was thoroughly investigated, and in fact, a lot of the evidence that MKB relies upon comes from the investigation. So there was no notice. If you look at the 20-day letter, there's nothing in the 20-day letter that says you're failing to pay, you're wrongful in denying the claim. Instead, the letter is complaining about other things that are not supported by the evidence. So there was no notice of the IFCA violation. Also, we would like to point out that the finding that of IFCA damages, it's very clear that the IFCA damages that was claimed was the cost that MKB incurred to sue the school district, to get paid under the contract. That's not caused by anything the insurance company did. The school district withheld $1.4 million when it fired MKB, and MKB took it to arbitration, and MKB collected through the arbitration $1.4 million. MKB argues, well, if you'd paid our insurance claim, we would have had to sue the school district. Well, the insurance claim at the time included the $1.4 million that the school district owed. The district court ruled on partial summary judgment that the $1.4 million owed by the school district, which the school district paid, is not covered by the insurance policy. So, therefore, MKB was claiming from Zurich something that the Zurich policy never owed, and this court ruled it was not owed, and it pursued the school district, got paid for it. And American Zurich's claim handling and payment of the other $1 million, the other cost in the claim, have nothing to do with MKB trying to collect and actually pay the school district, and actually collecting $1.4 million from the school district. And I would like to reserve the rest of my time. Good morning, and may it please the court. My name is Ken Friedman. I'm one of the attorneys for MKB. With me today is Richard Dykstra, another attorney representing them, as well as Mark Jensen, the president of MKB Constructors. There are two distinct subject matters involved in this appeal. One of them is very technical and factual, complex, which is the gravel issue and the breach of contract and the cost of repairing the damage to the engineered pad, and I'm going to address that first. The second issue is more of a legal issue, involves the Insurance Fair Conduct Act and the standards there and what the jury did with enhanced damages. And that's an interesting legal issue, but not factually complex. And I want to start, though, before, because I'm going to forget because it's not in my prepared notes, addressing one thing Mr. Gross just said, which is that Judge Robart in partial summary judgment ruled that the $1.4 million payment that was withheld by the school district was not covered under the policy. That was not Judge Robart's ruling, and Judge Robart in his post-trial motion made that clear. He said, I didn't rule it wasn't covered. I ruled that there was to be no double recovery, and that's why they cannot recover it again. He never ruled that it wasn't covered, and in fact, we would argue it was covered under the policy. So I just wanted to clear that one factual dispute. This was a builder's risk policy. Whether or not it covers voluntary and contractually obligated cost is not in dispute. Of course it doesn't, and we've never argued that voluntarily assumed and contractually obligated cost should be covered under this policy. So there's not a legal question about that. There's a factual dispute. Was there enough gravel estimated and brought to the site to cover the contractually obligated cost, and then was additional gravel necessary because of earth movement? There was an earth movement endorsement to this policy. Those are the arguments that were both sides made to the jury, and the jury decided in estimated by MKB, and that amount of gravel was part of their bid, and when that gravel sunk more than the estimated two inches, up to additional nine and a half inches, MKB was obligated to repair that damage to the pad and brought additional fill in to do it. The cost that the jury awarded was cost that the evidence shows was the responsibility of MKB because of the additional cost. If not for the sinking, the earth movement beyond two inches, MKB would have had sufficient gravel on the site to complete the project without needing additional shipments and spending additional money. Why was that not the school district's obligation? It may have been, but it was certainly a Zurich's obligation. Once the school district paid the contractual damages from the school district contract, Judge Robart said, well, you've recovered that, so you can't recover it again. But the other expenses, they were insured against. And there's never been a subrogation? You know, I don't know. It certainly wasn't part of our trial. The question is, was there sufficient evidence for the jury to reach that conclusion, that the additional gravel was necessitated by earth movement? And the factual record is dense on that. It starts with Mr. Jensen's estimate of 23,000 cubic yards. Other estimates of 23,000 cubic yards, including by Zurich's own expert, Mr. Johnson of Nino and More, other contractors and other people within MKB estimated between 18,000 and 22,000 cubic yards. So the record is full of information from which a jury could say, well, they estimated 23,000 yards and that was adequate. And therefore, when they needed to bring in the additional gravel, it was because of the earth movement. As Judge Robart had noted, this is a factual dispute, not a legal one. And both sides were given ample time and jury instructions from which they could argue their position. Counsel, if I could interject a question, please. So which particular jury instructions or instruction is most pertinent on the question of whether MKB estimated enough gravel to start or whether it was caused by earth movement? I think the instruction that would be most pertinent to that would be when the judge instructed the jury what we had to establish, which is instruction 22. What record site? That's at 1810 of volume 10. Thank you. And in that instruction, it says MKB Constructors has the burden of proving each of the following propositions of its claim on breach of contract and it lists four elements. And then it goes on and lists four affirmative defenses that Zurich has raised citing the contractual exclusions 2A, 2F, 3C and the issue of fortuity and instructs the jury on those. So the jury was well instructed on both what we would have to prove on our claim and what Zurich would have to prove on their affirmative defenses. And to answer a question the court asked of Mr. Gross, and this is at volume 9, 1579, I think the following page as well, Mr. Vasquez on behalf of Zurich during the jury instruction conference said defendants would take exception to instructions 22, 23 and 24 for the following reasons. The instructions instruct the jury to determine whether coverage exists under the policy. This determination requires the jury to interpret provisions of the policy and went on to say that was mistaken. As Judge McGowan noted, that argument has not been briefed on appeal and is apparently abandoned. And so those three instructions were objected to. The only objection to instructions on appeal is the verdict form. Verdict form and then the punitive damages going to the jury. That's correct. That's correct. And on the verdict form issue, Mr. Vasquez said, and this is at page 1579 of volume 9, defendants take exception to the verdict form for the same reasons, that the verdict form requires the jury to determine whether coverage exists under the policy, which is a determination of law. And as you know, Judge Robart thought it was not a determination of law. It was a factual question about whether or not the policy was breached, not a question of what the policy said. Objections to a verdict form must be sufficiently specific and formal to put the court on notice that it is committing an error of law or an abuse of discretion. That's United States v. Parsons Corporation. This objection to the verdict form at trial is not the objection that's being made here, which is the verdict form should break down each of the five alleged breach of contracts so we can have a separate ruling on each. The court did not tell the jury that they had to find all or nothing. The jury could find, and Mr. Gross certainly argued in his closing argument, through each of the five breaches of contract and each of the damages related to each of those theories and ask the jury not to award them. So it was not confusing to the jury to ask them was there a breach of contract and then if so, what are the damages, because they were given, including from the very first claim that was made following this incident, a breakdown by category of each of the category of damages, and that was in evidence as well. So the jury would have had no trouble, for example, if they wanted to exclude the barging expenses from making that mathematical calculation. So I don't think the verdict form issue was preserved. I don't think there was anything wrong with the verdict form. I think there was adequate evidence for the jury to find that earth movement caused all the damages that the jury awarded and that was covered by the policy. So I'd like to move to an issue that is of first impression to this court is the Insurance Fair Conduct Act. And there are several issues co-mingled in the Insurance Fair Conduct Act arguments. First is whether or not to award enhanced damages, it requires dishonesty or malice. And there are two issues that are confused here. One is the standard for which punitive damages can be assessed. Are punitive damages appropriate, yes or no? And the second is the standard by which courts review the amount of damages assessed by the jury. Was it too large? Was it unconstitution for some reason? Well, in this case, punitive damages can be assessed on the Insurance Fair Conduct Act for unreasonable conduct. Other states have higher standards. Some states say you have to prove reckless disregard or malice. Washington does not. And this is why we said they're really arguing that it's unconstitutional. Because the statute says you can enhance damages under IFCA for unreasonable conduct. And they're arguing in their brief that that's unconstitutional, that you need a higher standard. Well, they didn't argue that below and they didn't argue in their brief pursuant to Appellate Rule 44 or 5.1 of the civil rules that there's anything unconstitutional about enhancing damages based on a standard of unreasonable. So I think if you start from the proposition that it's constitutional for a state to enhance damages for unreasonable conduct, then the question is, well, was the amount that the jury awarded in this case. Let me just get your view. Okay. So they do say in their brief that they're punitive and they need to be vacated as excessive and unconstitutional. Correct. But you're saying that they didn't challenge the statute itself and its standard as unconstitutional. That's right. All right. The statute allows damages to be enhanced. Different standard. Mm-hmm. It's a low standard. It's the lowest one I think that I've seen for enhanced damages, but they didn't argue that there's anything wrong with that or that the statute is unconstitutional. Counsel, when you say that, or earlier you said there was an issue of first impression here. If that issue as to the statute was not raised in the below or wasn't raised in the opening brief, then is that waived? I think so. So we really wouldn't have to reach that? That's correct. Issue you framed. I don't think you should, with all respect. I think when I was talking about the issue of first impression is whether or not the judge or the jury enhances the damages, and I'll get to that in one moment.  damages. It was $860,000, roughly, in this case, which was less than the actual damages. As you know, the statute, RCW 4830.015, allows somebody, either the jury or the judge, to award up to treble damages for enhancing based on a ratio with actual damages. Zerk argues that that's outrageous or unreasonable or unconstitutional, but they don't really outline why or what the proper amount should be. If, for example, in the Campbell case, $145 million on $1 million of actual damages, they were arguing, well, it should be, $1 million in punitive damages should be the limit. Here, where the punitive damages are less than the actual damages, there's really no, there's nothing to hang your hat on and say, well, it should be $50,000, it should be $500,000, it should be $5 million. It's really within the discretion of the finder of fact to determine what's the appropriate amount to achieve the standards of the statute. And the judge instructed the jury that these enhanced damages are discretionary with the that they are to serve the purposes of punishing Zerk and deterring further conduct like this in the future, and that they should not let sympathy or prejudice influence their decision, and it should be a reasoned decision. And we can assume that the jury did that, since they didn't even ask, they didn't even award the amount that we asked them to, they awarded a less amount. So the question then is, is it constitutionally permissible? And then you have to look at the cases where the court, mostly the Supreme Court has ruled certain punitive damage awards are unconstitutional because of the due process clause. And as we go through this in pretty good detail in our brief, the reason for all of that was to avoid arbitrary determinations by juries and totally unfettered discretion. That without some kind of standards, that there's a due process violation, because a jury in one case could do one thing and something in another case could be $145 million on the same conduct, and you're not really giving companies notice of what they're looking at. Well, IFCA does give notice. It says it's three to one. And so they have notice. The jury's discretion is limited by that same statute, and there is no constitutional violation for anything that's within that statute, because they have notice of what kind of conduct can support an award of enhanced damages and how much the penalty can be. So given that notice, there is no constitutional violation, and you don't have to look at the Okay, so given what the Supreme Court said in that BMW case about multiples and cautioning against double digits and given what we said, and I think it was a planned parenthood case that absent reprehensible conduct, we'd normally not go beyond four times, what's the issue for us in the constitutionality of the state statute here? I don't think you have an issue. What saves this statute is the limit of treble damages. It can't exceed that. So anything within that, they're already on notice. And so I could not find a court anywhere in the country that said an award that's less than a one-to-one ratio would fail constitutional scrutiny. That's what I was going to ask you. I mean, all of these relate to a multiplier based on compensatory damages. Correct. And the notice point he made, though, I thought was slightly different, and that was not that the statute gives you notice that you have a cap of three, but that the specific conduct that triggered the punitive damages was a disconnect between the so-called notice under the statute and then what went to the jury. Would you address that? Yes, I will, because that is a shift from their opening brief to their reply brief. The notice required by the statute is listed in the statute, and it says you have to . . . well, 20 days prior to filing an action based on this section, a first-party claimant must provide written notice of the basis of the cause of action to the insurer and office of the insurance commissioner. So it doesn't really tell you too much about what you have to tell them. And then they have 20 days to cure it. And what they can do during those 20 days is more investigation. They can ask for more time. They can reverse their decision. In this case, they decided to reaffirm their decision and deny the claim again, or at least reaffirm their denial after the 20-day notice. So the statute doesn't say exactly what notice, and you have to understand that this notice has to be sent when the claim is denied and before any discovery takes place. From the time of the 20-day notice to the time of trial, there was all kinds of discovery and experts disclosed and reports. So they knew exactly what our theory was way before the court trial. But if you also look at our 20-day notice, it is a lot more detailed than Mr. Gross's summary of it would lead you to believe. And this is at volume 33, page 6692. There's a one-page form that the insurance commissioner has you use for your notice, and then there's a cover letter. In this case, Mr. Dugster wrote it, dated April 4, 2013. And it's six pages, and it goes through in detail that Zurich misrepresented policy provisions by ignoring the dominant cause of the Earth Movement, which damaged the building pad. There's a whole section on refusing to pay the claim without conducting a reasonable investigation with six subsections outlining the different theories about why this claim should have been paid. So if you look at that letter, I think you will find that constitutionally they are on the same page as the complaints were, and it certainly complied with the statute. And there's nothing unfair or unconstitutional about a jury holding them responsible for that. Which leads us to maybe the last question, which is whether or not the jury, rather than the judge, gets to decide that. And the Third Circuit said yes on almost an identical Pennsylvania statute that says the court should do it, not the jury. The district court in Kansas that we cited said yes with almost identical Kansas statute that says the statute said the judge should do it, and the federal court in Kansas said no under the Seventh Amendment, that's a procedural question, and a jury should do it. And then, of course, three decisions from this district have all reached the same conclusion. The only citation that always comes up in this argument is the Toll case. And in Toll, they said it's okay for the judge and not the jury to decide the award of penalties under the Clean Water Act. And Toll has been distinguished time and time again, and it's very easily distinguished. Toll specifically relies on the fact that it's a penalty to the government and not a dispute between private parties. And they said when it's a penalty to the government, Congress could set the amount of the penalty so Congress can delegate that to a federal judge. So if treble damages are a form of punitive damages, and that's a common law issue, then it's under the Seventh Amendment, the jury decides it, right? That's correct. Thank you. Thank you. I think we have a little time for rebuttal. Thank you, Your Honor. I want to go back to the core, although if there are any questions, I'd be happy to answer them. Did you want to point me to where you challenged those jury instructions in your brief? Oh, I believe counsel graciously pointed out that you didn't. Oh, in our brief? Never mind. I apologize, Your Honor. I couldn't find it in what I heard. I couldn't find it compared to the trial record, but that's fine. Thank you, Your Honor. It's true that this Court decides things that are legal and does not question what a jury decided as a matter of fact. But when there is not substantial evidence for a jury verdict, that's when it becomes a legal question. And the legal question here, the starting point, is how much gravel was MKB required to place on that pad? And did it place that amount of gravel? How much the pad may have sunk or did sink is a distraction. That's irrelevant. What matters is what is the evidence of what they were voluntarily and contractually bound to place. The evidence, there's no substantial dispute in the evidence. All of the experts came up with about 26,600 cubic yards. Mr. Jensen, he actually came up with 30,000 yards. He said he swore, certified as true to the school district, that the initial estimate was false. Mr. Blake, who they rely upon, he sent a letter to the school district saying that . . . I'm they were actually 4,700 cubic yards short in their initial estimate. Everybody says that their initial estimate was false. Their belief of what should be required is not the standard. What the standard is, what did the contract require? There was only . . . and this is an area of expert testimony, and there's only one expert witness at trial to talk about it, and that was Mr. Fortunato. He pointed out how all experts came up to generally the same conclusion. Nino and Moore, Mr. Johnson, they were an outlier, and that's explained in undisputed ways why their estimate was different. It's because they were using an outdated AutoCAD program that was using 25-foot grids. That's laid out in the brief. There was no disputed evidence as to why his estimate was . . . and frankly, that was part of American Zerg's investigation. But everybody, MKB's experts at Earthworks, their surveyor, the school district's experts, they all came up with the same numbers, roughly, about 26,600 cubic yards. MKB made no effort to really put into evidence at trial how much gravel they put on the pad, but the evidence at trial was undisputed and shown in our brief, was less than 25,000 cubic yards. They did not put in the amount of gravel required. It's undisputed that the gravel that ultimately, later on, the school district put in paid a lot more money to bring in a lot more gravel. So whatever gravel settlement there was, was paid for by the school district. This now becomes a legal question because there is no substantial evidence, to the contrary, that MKB was short in the gravel that they were contractually bound to put on the pad and the school district paid for the rest. Thank you. Thank you. Thank both of you for your argument this morning. The case of MKB Constructors v. American Zurich is submitted and we're adjourned.
judges: McKeown, Gould, Foote